IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

VICKI FISHER,                                  )        CASE NO.  1:19-cv-01777
                                               )
                    Plaintiff,                 )        MAGISTRATE JUDGE
                                               )        KATHLEEN B. BURKE
            v.                                 )
                                               )
COMMISSIONER OF SOCIAL                         )
SECURITY,                                      )
                                               )        **MEMORANDUM OPINION & ORDER**
                    Defendant.                 )

Plaintiff Vicki Fisher ("Plaintiff" or "Fisher") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On November 4, 2013, Fisher protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Tr. 56, 157-170, 512.  Fisher alleged a disability onset date of February 7, 2013.  Tr. 56, 157, 512.  She alleged disability due

1

to back problems, vision problems, numbness, high blood pressure, and diabetes.  Tr. 56, 96, 107.

After initial denial by the state agency (Tr. 96-101) and denial upon reconsideration (Tr. 107-118), Fisher requested a hearing (Tr. 119-120).  A hearing was held before an administrative law judge ("ALJ") on January 14, 2016.  Tr. 32-45, 512.  On February 8, 2016, the ALJ issued an unfavorable decision (Tr. 16-31), finding that Fisher had not been under a disability, as defined in the Social Security Act, from February 7, 2013, through the date of the decision (Tr. 19).  Fisher requested review of the ALJ's decision by the Appeals Council.  Tr. 512.  On January 11, 2017, the Appeals Council denied Fisher's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 3-6.

On February 14, 2017, Fisher filed an appeal with the United States District Court for the Northern District of Ohio.  Tr. 512; *Fisher v. Comm'r of Soc. Sec.*, Case No. 1:17-cv-00302.  On August 28, 2017, the district court remanded the Commissioner's final decision.[1]  Tr. 512, 672-676.  On January 8, 2018, the Appeals Council issued its Notice of Order of Appeals Council Remanding Case to Administrative Law Judge.  Tr. 672-676.   The Appeals Council ordered that, upon remand, the Administrative Law Judge evaluate Fisher's mental impairments.  Tr. 675.  Also, in its remand order, the Appeals Council noted that Fisher had filed a subsequent claim for DIB and SSI benefits on February 1, 2017, and ordered the administrative law judge to consolidate those claims with the prior claims and to issue a new decision on the consolidated claims.  Tr. 675; *see also* Tr. 513, 735-741, 742-747.

A hearing was held before the ALJ on July 10, 2018.  Tr. 541-558.  On July 30, 2018, the ALJ issued an unfavorable decision (Tr. 509-540), finding that Fisher had not been under a

---

[1] The parties had jointly moved for a sentence four remand.  *See Fisher v. Comm'r of Soc. Sec.*, Case No. 1:17-cv-00302, Northern District of Ohio.

disability, as defined in the Social Security Act, from February 7, 2013, through the date of the

decision (Tr. 514).  Fisher requested review of the ALJ's decision by the Appeals Council.  Tr.

502-508, 726-731.  On July 19, 2019, the Appeals Council denied review, making the ALJ's July

30, 2018, decision the final decision of the Commissioner following remand by the court.  Tr.

502-508.  On August 6, 2019, Fisher filed the appeal pending in this case.  Doc. 1.

## II. Evidence

**A.  Personal, vocational and educational evidence**

Fisher was born in 1963.  Tr. 529.  She lives with her mom and brother at her mom's

house.  Tr. 545.  She has at least a high school education.  Tr. 529.  Fisher's past work included

work as a general laborer, machine operator, warehouse worker, and prep cook and dishwasher.

Tr. 554.

**B.  Medical evidence[2]**

**1.  Treatment history**

Although Fisher's alleged disability onset date extends back to February 7, 2013, her

mental health treatment records are dated from 2014 through at least 2018.  *See e.g.*, Tr. 327-

337,351-377,419-501,905-981,1024-1037,1098-1119.  Fisher's mental health treatment has been

provided by Catalyst Life Services.  *Id.*  Upon her family physician Dr. Davis's recommendation

(Tr. 335), on June 25, 2014, Fisher underwent an Adult Diagnostic Assessment (Tr. 327-337).

The assessment was conducted by Nicole C. Rollins, MSW, LSW.  Tr. 337.  At the time

of the assessment, Fisher was 50 years old.  Tr. 335.  Dr. Davis recommended the assessment

because Fisher was "feeling so down and depressed[,]"  Tr. 335.  Fisher relayed that she felt she

---

[2] Plaintiff's summary of the medical evidence includes evidence pertaining to her alleged physical impairments.
Doc. 15, pp. 3-7.  However, the arguments raised in this appeal pertain to the ALJ's analysis of her alleged mental
health impairments.  Accordingly, the medical evidence summarized herein is generally limited to evidence relating
to Plaintiff's alleged mental impairments.

could not function and she cried all the time.  Tr. 335.  Dr. Davis was prescribing Fisher Prozac

for her depression and Fisher thought it "helped some[]" but she still felt "shaky and weepy all

the time."  Tr. 335.  Fisher reported that she did not want anyone around her; she did not want to

be touched; and she wanted to hide from everything and she sat in a dark bedroom and cried all

the time.  Tr. 335.  Fisher indicated that she felt anxious and nervous when there was a lot of

noise or people and she did not leave her house unless it was absolutely necessary.  Tr. 335.

Fisher felt that everything was closing in on her.  Tr. 335.  Fisher reported poor sleep.  Tr. 335.

She was willing to see a physician for medication management.  Tr. 335.  Ms. Rollins'

assessment was major depressive disorder, recurrent, moderate and generalized anxiety disorder.

Tr. 335.  Ms. Rollins assigned a GAF score of 40.[3]  Tr. 335.  She recommended pharmacological

management.  Tr. 335.

On September 11, 2014, an initial psychiatric evaluation was conducted by Faye Grund,

APN.  Tr. 422-428.  On mental status examination, Fisher was observed to be well groomed;

mildly overweight; mildly mistrustful and withdrawn; her eye contact and activity were average;

her speech was clear; her thoughts were logical but mildly racing; her mood was moderately

depressed and severely anxious; her affect was moderately flat; she was cooperative; she

exhibited mild anhedonia; she was severely withdrawn; her memory was mildly impaired; her

intelligence was average and her insight/judgment was fair.  Tr. 424-426.  Fisher reported

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a
hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical
Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric
Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality
testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several
areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends,
neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing
at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See*
American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition,
Arlington, VA, American Psychiatric Association, 2013  ("DSM-5"), at 16.

anxiety symptoms that were disabling for her functioning. Tr. 426. Fisher indicated that her mood was a "1" on a scale of "1-10" with "10" being the best and her anxiety was a "1" on a scale of "1-10" with "10" being no anxiety. Tr. 426. Fisher was diagnosed with major depressive disorder, recurrent, moderate and panic disorder with agoraphobia and assigned a GAF score of 45.[4] Tr. 426-427. As justification for the diagnoses, it was noted that Fisher's mood was low and she was unable to leave her room unless there was no one else in the room. Tr. 427. Fisher's Prozac was increased; she was prescribed Trazadone to help with sleep issues; and she was prescribed Buspar for her anxiety symptoms. Tr. 427.

Fisher saw counselor Charlene Santee, PMHCNC-BC, on December 23, 2014. Tr. 354-356. Fisher reported that she could not leave her house because she would get nauseated and she generally stayed in her bedroom and looked out the window. Tr. 354. Fisher listened to music. Tr. 354. She relayed that she did not think that the Prozac was helping and the Trazadone did not help her sleep. Tr. 354. Fisher indicated she did "OK" when no was around but, if other people were around, she could not do things. Tr. 354. Fisher reported feeling that way for two years and relayed that she cried constantly. Tr. 354. She was taking her medications as prescribed without side effects. Tr. 354. Fisher's sister organized Fisher's pills for her in a pill container. Tr. 354. Fisher indicated her concentration was fair; her motivation and energy were poor. Tr. 354. On mental status examination, Nurse Santee observed that Fisher was dressed appropriately; she had good eye contact; her speech was clear and coherent with a normal rate, rhythm and volume; her language was normal for her age; her fund of knowledge was within normal limits; her thought process was logical and organized; her thought content was relevant;

---

[4] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR, at 34.

she denied audio and visual hallucinations; her mood was dysphoric; her affect was labile; she denied homicidal and suicidal ideation; she was calm and cooperative but tearful; she was alert and oriented x 4; and her insight/judgment appeared limited.  Tr. 354.  Nurse Santee increased Fisher's Prozac and Trazadone, continued Fisher's Buspar, and added Seroquel.  Tr. 355.

Fisher saw Nurse Santee again on January 16, 2015.  Tr. 357-359.  Fisher relayed that the Prozac was helping her and the Trazadone was helping her get to sleep.  Tr. 357.  Nurse Santee's mental status findings were generally the same as on the prior visit but Nurse Santee noted that Fisher's mood was "mildly dysphoric, but a little better" and her affect was sad.  Tr. 357.  Nurse Santee continued Fisher's medications but increased the Seroquel dosage.  Tr. 358.  Nurse Santee noted that Fisher was scheduled to see Vickie Jarvis for a therapy appointment.[5]  Tr. 358.

Fisher saw Nurse Santee the following month on February 16, 2015.  Tr. 360-362.  Nurse Santee noted that Fisher presented "a little better[,]" "even initiated conversation" that day, and "even smiled a couple of times."  Tr. 360.  Fisher reported that she still could not leave her house without feeling nauseated.  Tr. 360.  She explained that, on the day she had to visit her therapist, she fainted and broke a tooth.  Tr. 360.  Fisher continued to report that the Prozac and Trazadone were helping.  Tr. 360.  She was not crying as much as she had been.  Tr. 360.  Nurse Santee noted that the increase in medication was helping Fisher sleep but she was still having some depression and anxiety issues.  Tr. 361.  Nurse Santee increased Fisher's Seroquel again to help with Fisher's mood/anxiety.  Tr. 361.  Nurse Santee noted that Fisher should continue her therapy with Ms. Jarvis.  Tr. 361.

When Fisher saw Nurse Santee on March 16, 2015, (Tr. 363-365), Fisher relayed that she was seeing her therapist Ms. Jarvis every two weeks and she indicated that she did not "feel as

---

[5] Counseling notes from Fisher's sessions with Ms. Jarvis from February 3, 2015, through December 10, 2015, are found in the record at Tr. 480-501.

guilty like everything [was] [her] fault[]" (Tr. 363).  Fisher also relayed that the Buspar was

helping with her anxiety and she was not chewing on her fingers like she had been.  Tr. 363.

Nurse Santee noted on mental status examination that Fisher's mood was "mildly dysphoric, but

much better[.]"  Tr. 363.  Fisher's affect was still noted to be "sad."  Tr. 363.  Nurse Santee

continued Fisher's medication but increased the Seroquel again to help with Fisher's

mood/anxiety.  Tr. 364.

 During visits with Nurse Santee in April and May 2015, Fisher was doing much better.

Tr. 366-371.  She relayed that she had been sitting on her roof porch, getting some sun, and

watching the kids play.  Tr. 366, 369.  Fisher was not crying like she had been and reported

feeling better.  Tr. 366, 369.  Nurse Santee observed that Fisher's mood was euthymic and her

affected was blunted but not as sad.  Tr. 366, 369.  Fisher was continuing to see Ms. Jarvis for

therapy.  Tr. 369.  During the May 11, 2015, appointment, Nurse Santee noted that Fisher was

doing much better but still tended to isolate.  Tr. 370.  Nurse Santee continued Fisher's

medications.  Tr. 370.

 In June and July 2015, Fisher was continuing to do better but had a setback due to it

being the anniversary of a traumatic event that Fisher had encountered when she was 16 years

old.  Tr. 372, 375.  Fisher reported that her anxiety was much better and she was not chewing on

her fingers like she had been.  Tr. 372, 375.  Fisher's concentration, motivation and energy were

better.  Tr. 372, 375.  At the June 8, 2015, appointment, Nurse Santee noted that Fisher was

doing much better but also noted the setback that Fisher had due to the anniversary of a prior

traumatic event.  Tr. 373.  Nurse Santee continued most of Fisher's medications except she

increased the Seroquel and discontinued the Trazadone.  Tr. 373.  At the July 6, 2015,

appointment, Nurse Santee did not make any changes to Fisher's medications.  Tr. 376.

During an August 20, 2015, appointment with Nurse Santee, Fisher was mildly dysphoric and she had a blunted, labile affect.  Tr. 444-446.  Fisher had not seen her therapist, Ms. Jarvis, for over a month.  Tr. 444.  She planned to schedule an appointment with her.  Tr. 444.  Nurse Santee noted that Fisher was doing better but had a small setback since she had not been attending her therapy sessions.  Tr. 445.  Fisher's medications were continued.  Tr. 445.

When Fisher saw Nurse Santee on September 17, 2015, (Tr. 441-443), Nurse Santee noted that Fisher was doing better but had a small setback because her father had been in the hospital with pneumonia which had caused her to feel down for about a week (Tr. 442).  Fisher was also worried about a niece who had recently had a baby.  Tr. 442.  The following month, Fisher's niece and father were doing well but (Tr. 443) Nurse Santee noted that Fisher had another setback because her nephew had overdosed and died (Tr. 443, 445).

During November and December 2015 appointments with Nurse Santee (Tr. 429-435), Fisher expressed concerned about too many people being around during the holidays (Tr. 429, 440).  Fisher's father was doing better but her uncle required brain surgery due to his brain cancer.  Tr. 429.  Fisher's anxiety, concentration, motivation and energy continued to be better but her sleep was not good.  Tr. 429.  Nurse Santee observed that Fisher's mood was euthymic; her affect was blunted.  Tr. 429, 433.  Fisher had started to use an exercise bike in her room.  Tr. 429.

Fisher continued to see Nurse Santee during 2016.  Tr. 906-937.  During a March 10, 2016, appointment, Nurse Santee noted that Fisher was having some anxiety and depression issues.  Tr. 906.  Fisher did not think that the Prozac was working like it had been so Nurse Santee advised Fisher to taper off the Prozac and Fisher was starting to take Zoloft.  Tr. 906.  At a subsequent March 30, 2016, appointment, Nurse Santee discontinued the Prozac and increased

the Zoloft.  Tr. 908.  Fisher relayed that her sleep had not been good and when she was able to

sleep she was having nightmares.  Tr. 908.  Fisher reported that she was using her exercise bike

"some."  Tr. 908.  She was tired all the time; she was taking her Seroquel in the morning – Nurse

Santee reminded Fisher she was supposed to take her Seroquel in the morning and Zoloft at

night.  Tr. 908.  Nurse Santee observed that Fisher's mood was euthymic and her affect was

blunted.  Tr. 908.

   The following month, Fisher relayed to Nurse Santee that her uncle had passed away.  Tr.

911.  She was very tearful talking about him.  Tr. 911.  Her sleep still was not good.  Tr. 911.

Her concentration was good; her motivation and energy varied.  Tr. 911.  Fisher was less tired

since taking Seroquel at night.  Tr. 911.  Nurse Santee noted that Fisher's mood was euthymic

and her affect was blunted.  Tr. 911.  She was alert and oriented and appeared to have limited

insight/judgment.  Tr. 911.  Nurse Santee indicated that Fisher was having some anxiety and

depression issues but Fisher stated she was doing better than she had been.  Tr. 912.  Fisher liked

Zoloft and Nurse Santee continued Fisher's medications.  Tr. 912.

   During a May 25, 2016, appointment, Nurse Santee observed Fisher's mood to be

euthymic; her affect was blunted.  Tr. 914.  Fisher was alert and oriented.  Tr. 914.  Fisher

reported that a cousin had died from an overdose.  Tr. 914.  Fisher's father was doing well.  Tr.

914.  Fisher liked Zoloft.  Tr. 914.  Fisher was not having her weird dreams.  Tr. 914.  It was still

hard for Fisher to be around people.  Tr. 914.  Nurse Santee continued Fisher's medications.  Tr.

914.

   During a June 2016 visit, Fisher relayed that she was having some depression because

she had recently found out that her dad had lung cancer.  Tr. 917.  Fisher's mood was sad and her

affect was blunted.  Tr. 917.  Fisher's medications were continued.  Tr. 917.

During visits with Nurse Santee in July through December 2016, Fisher relayed information concerning her father's health.  Tr. 920-934.  Fisher and other family members were helping take care of her dad.  Tr. 923, 926, 929, 932.  Fisher reported that she had some depression.  Tr. 920, 923, 926, 929.  At times, Fisher reported that her depression was "not bad." Tr. 920, 923.  Fisher continued to find it difficult to be around people.  Tr. 926, 929.  Mental status examinations showed varying moods (sad, euthymic, and mildly dysphoric) and a blunted affect.  Tr. 920, 923, 926, 929, 932.  Nurse Santee continued Fisher on her medications during this period.  Tr. 920-934.

When Fisher saw Nurse Santee on January 19, 2017, Fisher continued to report that it was difficult for her to be around people.  Tr. 938.  She still liked being on Zoloft.  Tr. 938.  She was not sleeping very well but she was not having as many weird dreams.  Tr. 938.  She had some depression because she was worried about family members.  Tr. 938.  Fisher was still helping take care of her dad.  Tr. 938.  Her concentration, motivation and energy varied.  Tr. 938. Fisher was alert and oriented; her mood was mildly dysphoric; and her affect was blunted.  Tr. 938.  Nurse Santee noted that Fisher was doing better that day.  Tr. 939.  Fisher's medications were continued.  Tr. 939.

During an April 11, 2017, counseling session with Ms. Jarvis, Fisher relayed that her father had died.  Tr. 1028-1029.  Fisher was very upset; she was worried about her mother; and she was isolating and feeling very out of it.  Tr. 1028.  Ms. Jarvis noted that Fisher was crying often throughout the counseling session and describing typical symptoms of grief.  Tr. 1028. Fisher also saw Nurse Santee in April 2017.  Tr. 1032-1034.  During her appointment with Nurse Santee, Fisher was upset about her father and was missing him.  Tr. 1032.  She reported some depression since her father's death.  Tr. 1032.  She was still having problems sleeping.  Tr. 1032.

Fisher's concentration, motivation and energy varied.  Tr. 1032.  It was still hard for Fisher to be around people.  Tr. 1032.  She lived with her mother and brother.  Tr. 1032.  Nurse Santee described Fisher's mood as mildly dysphoric and her affect was blunted.  Tr. 1032.  Nurse Santee continued Fisher's medications and continued to recommend therapy with Ms. Jarvis.  Tr. 1033.

During a June 1, 2017, appointment with Nurse Santee, Fisher relayed that she still had some depression due to her father's death.  Tr. 1035.  Fisher indicated that she was having a hard time staying asleep.  Tr. 1035.  She was not having as many weird dreams – only about 2-3 each month.  Tr. 1035.  Her concentration, motivation and energy still varied; her mood was observed to be mildly dysphoric and her affect was blunted.  Tr. 1035.

Fisher saw Nurse Santee on August 15, 2017.  Tr. 1116-1119.  Fisher relayed that she was having some physical health issues and her doctor was running some tests; this was waking Fisher up at night.  Tr. 1116.  Fisher was still having depression related to her father's death – they were going to be choosing a tombstone that day.  Tr. 1116.  Fisher indicated that her mood had not been good – she felt sick all the time and was having migraines.  Tr. 1116.  Fisher was still having a hard time being around people.  Tr. 1116.  Being around a lot of people or having to go out in public made her anxiety and depression worse.  Tr. 1116.  Being able to stay in her room and not be bothered by people helped relieve her anxiety and depression.  Tr. 1116.  Fisher's mood was mildly dysphoric and her affect was blunted, labile.  Tr. 1117.  Fisher's diagnoses were major depressive disorder, recurrent episode, moderate; generalized anxiety disorder; and bereavement.  Tr. 1117-1118.  Nurse Santee continued to recommend therapy with Ms. Jarvis and she continued Fisher's medications.  Tr. 1117-1118.

During October and December 2017 appointments with Nurse Santee, Fisher continued to report that she was having a hard time dealing with her physical health issues and was continuing to grieve the loss of her father and other family members.  Tr. 1108-1115.  Nurse Santee continued Fisher's medications.  Tr. 1110, 1114.

When Fisher saw Nurse Santee in February 2018, she continued to report being "kinda down and depressed[.]"  Tr. 1100.  Fisher commented that it had been a year since her dad had died and she was worried about family members getting older and sick.  Tr. 1100.  She was waking up to weird dreams and still having a hard time being around people.  Tr. 1100.  Her concentration varied but her motivation and energy were better.  Tr. 1100.  Fisher's mood was mildly dysphoric and her affect was blunted, labile.  Tr. 1101.  Fisher's medications were continued.  Tr. 1101-1102.  Fisher also saw Ms. Jarvis in February 2018.  Tr. 1098-1099.  During that session, Fisher relayed that a cousin and three of his toddler children had moved in with them and it was very nerve racking because Fisher did not like being around people.  Tr. 1098.  Fisher relayed that her sister did a lot of the shopping for her.  Tr. 1098.  When neighbors would come over to visit and check on Fisher's mom, Fisher was unable to greet them.  Tr. 1098.  Also, Fisher reported having a hard time coming to counseling sessions.  Tr. 1098.  Ms. Jarvis noted that Fisher was very emotional and dependent.  Tr. 1098.

During a March 27, 2018, office visit relating to her back pain, the physician observed that Fisher had an appropriate affect and she was alert and oriented.  Tr. 1124.  Similar observations were made during earlier pain management visits.  Tr. 1127 (11/21/2017 visit); Tr. 1130 (10/3/2017 visit).

2. **Opinion evidence**

    a. **Treating sources**

_January 7, 2016, Medical Source Statement: Patient Mental Capacity_

On January 7, 2016, Nurse Santee completed a Medical Source Statement: Patient Mental Capacity check-box form that was co-signed by an M.D. wherein Fisher's capability to perform work-related activities was rated.  Tr. 420-421.  The signature of the M.D. is not very legible. Tr. 421.  However, both Plaintiff and Defendant indicate that the M.D. signature is that of Dr. Swarn (also referred to as Dr. Swann).[6]  Doc. 15, p. 9; Doc. 18, pp. 5-6.  The form indicated that Fisher had been "under the care [of] your practice or facility" since September 11, 2014.  Tr. 421.  The available "ratings" on the form were "constant" (ability to perform activity is unlimited); "frequent" (ability for activity exists for up to 2/3 of a work day); "occasional" (ability for activity exists for up to 1/3 of a work day); and "rare" (activity cannot be performed for any appreciable time).  Tr. 420.

Fisher was rated as being able to frequently maintain her appearance.  Tr. 421.  Fisher was rated as being able to occasionally perform the following 10 activities: follow work rules; use judgment; maintain attention and concentration for extended period of 2 hour segments; respond appropriately to changes in routine settings; understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple job instructions; behave in an emotionally stable manner; mange funds/schedules; and leave home on her own.  Tr. 420-421.

---

[6] Defendant indicates in his brief that, while Plaintiff refers to the M.D. as "Dr. Swann," Appeals Council documents refer to the doctor as "Frances Swarn, M.D." Doc. 18, p. 10, n. 4.  The Court will utilize the spelling as found in the Appeals Council documents, i.e., "Swarn."  Tr. 502, 727.

Fisher was rated as being able to rarely perform the following 11 activities: maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to co-workers; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; working in coordination with or proximity to others without being distracting; deal with work stress; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; socialize; and relate predictably in social situations. Tr. 420-421. The form indicated that Fisher had been diagnosed with major depressive disorder, moderate; generalized anxiety disorder; and PTSD. Tr. 421.

### July 18, 2017, Mental Status Questionnaire

On July 18, 2017, Nurse Santee completed a Mental Status Questionnaire that was cosigned by Dr. Swarn who is identified on the form by a stamp as "Collaborating Psychiatrist for Charlene Santee, PMHCNS-BC[.]" Tr. 1024-1027. The form reflects that Fisher was first seen on September 11, 2014, and last seen on June 1, 2017. Tr. 1025. The cover sheet included with the questionnaire that is also dated July 18, 2017, and signed by Nurse Santee, states in the request for medical information section that Fisher "sees Vicki Jarvis and Charlene Santill." Tr. 1024.

Fisher's diagnoses were major depressive disorder, recurrent, moderate; generalized anxiety disorder; and uncomplicated bereavement. Tr. 1026. Fisher's mental status was described as follows: appearance was "WNL";[7] flow of conversation and speech was "WNL"; mood and affect was "mood"; signs, symptoms and severity of anxiety was "hard for her to be

---

[7] The Court understands "WNL" to mean within normal limits.

around other people" and "isolates-worries"; Fisher denied audio or visual hallucinations; she was alert and oriented "x4"; as far was cognitive functioning - her memory was intact, her language was normal for her age, her fund of knowledge was within normal limits, and her concentration "varies"; and her insight and judgment appeared limited.  Tr. 1025.

In the Medical Source Statement (MSS) portion of the questionnaire, Fisher's ability to remember, understand and follow directions was listed as "WNL – unless [increased] anxiety [increased] depression[.]"  Tr. 1026.  Fisher's ability to maintain attention was listed as "WNL – unless [increased] anxiety [increased] depression[.]"  Tr. 1026.  Fisher's ability to sustain concentration, persist at tasks, and complete them in a timely manner was listed as "varies – depends on anxiety/depression[.]"  Tr. 1026.  With respect to Fisher's social interaction abilities, it was noted that Fisher "isolates – unable to be around others[.]"  Tr. 1026.  Fisher's adaptation ability was listed as "poor[.]"  Tr. 1026.  When asked how Fisher would "react to the pressures, in work settings or elsewhere involved in simple and routine, or repetitive tasks[,]" Nurse Santee indicated that Fisher was "unable to be around others – [increased] depression [increased] anxiety[.]"  Tr. 1026.

### April 16, 2018, Medical Source Statement – Mental Capacity

On April 16, 2018, Nurse Santee completed a Medical Source Statement – Mental Capacity form wherein she rated Fisher's ability to function in 32 categories using the following ratings: "no limitation," "mild limitation," "moderate limitation," "marked limitation," and "extreme limitation[.]"  Tr. 1120-1121.  There were eight categories in each of the following four areas: ability to understand, remember, or apply information; ability to interact with others; ability to concentrate, persist and maintain pace; and ability to adapt and/or manage oneself.  Tr.

1120-1121.  Nurse Santee rated Fisher as having mild limitations in all 8 of the categories under ability to understand, remember or apply information.  Tr. 1120.

Under ability to interact with others, Nurse Santee rated Fisher's ability to cooperate with others; ask for help when needed; and initiate or sustain conversation as mild to moderately limited.  Tr. 1120.  Fisher's ability to handle conflicts with others and her ability to state her own point of view were rated as mild to markedly limited.  Tr. 1120.  Fisher's ability to understand and respond to social cues and her ability to respond to requests, suggestions, criticism, correction and challenges were rated as moderately to markedly limited and her ability to keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness was rated as markedly limited.  Tr. 1120.  Under the "interact with others" area, Nurse Santee noted that Fisher was unable to be around a lot of people.  Tr. 1120.

With respect to Fisher's ability to concentrate, persist and maintain pace, Nurse Santee rated Fisher as being moderately limited in six of the eight categories and markedly limited in two of the categories (work close to or with others without interrupting or distracting them and work a full day without needed more than the allotted number or length of rest periods during the day).  Tr. 1121.

With respect to Fisher's ability to adapt and/or manage oneself, Nurse Santee rated Fisher as having mild or moderate limitations in four categories and marked limitations in the other four categories (respond to demands; adapt to changes; manage one's psychologically based symptoms; and make plans for oneself independent of others).  Tr. 1121.

When asked to "[s]tate the diagnosis and medical and clinical findings that support this assessment:" Nurse Santee stated "This patient is not able to function around a lot of people.  She

16

isolates most of the time to her room – even around family members – leaving the house makes things worse for her.  This increases depression and anxiety."  Tr. 1121.

### b.  Consultative examining psychologist

On April 27, 2017, consultative psychologist T. Rodney Swearingen, Ph.D., saw Fisher and conducted a psychological evaluation.  Tr. 995-1001.  Fisher was 53 years old.  Tr. 996.  She lived with her mother and her brother bought Fisher's personal items as needed.  Tr. 996.  Fisher relayed that she was attending counseling at Catalyst Life Services once a month and she received medication from Catalyst Life Services.  Tr. 997.  Fisher reported that she was no longer able to work "due to mental health issues, nausea, unable to breathe and doesn't like people closing in on her."  Tr. 998.  Fisher relayed that she spent most of her day staying in her room, looking out the window.  Tr. 998.  She tried to read but most of the time she would just sit and cry and chew on her fingers.  Tr. 998.  She socialized with her mom and siblings.  Tr. 998.

During the interview, Dr. Swearingen observed Fisher chewing on her fingers, pumping her legs, crying on and off; her tone of voice was normal and she exhibited no agitation; her speech was unimpaired and understandable; her affect was flat and very nervous; her mood was suspicious, fearful and restless; she was alert and anxious; she was oriented to person, place, time and situation; and her concentration and pace of tasks was fair and her persistence on task was good.  Tr. 998-999.  Fisher relayed that she mostly felt nervous and depressed; her appetite fluctuated; she had problems staying asleep; she had crying spells all the time; she felt worthless; she was anxious when people came to her house, when she had appointments or when her mother left the house; she had anxiety or panic attacks twice each month; she had agoraphobia; she was irritated easily when people talked too much or touched her arm; she had a fear of heights and closed spaces; and she worried a lot about her family.  Tr. 998-999.  Fisher explained

that symptoms associated with her panic attacks included shortness of breath, dizziness, lightheadedness, nausea, sweating and the urge to flee.  Tr. 998.

Dr. Swearingen's diagnostic impression was post-traumatic stress disorder; major depressive disorder, recurrent, with psychotic features; and agoraphobia.  Tr. 999.  Dr. Swearingen offered a functional assessment regarding Fisher's abilities.  Tr. 1000.

With respect to Fisher's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Swearingen opined that Fisher "is only able to follow one step instructions" and she "is impaired in her ability to follow directions and complete tasks at a reasonable pace."  Tr. 1000.

With respect to Fisher's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple and multi-step tasks, Dr. Swearingen opined Fisher "has a hard time staying focused" and "is impaired in her ability to concentrate."  Tr. 1000.

With respect to Fisher's abilities and limitations in responding appropriately to supervisors and coworkers in a work setting, Dr. Swearingen opined that Fisher "is impaired in her ability to maintain effective social interactions on a consistent and independent basis with supervisors, coworkers, and the public."  Tr. 1000.

With respect to Fisher's abilities and limitations in responding appropriately to pressures in a work setting, Dr. Swearingen opined that Fisher "is impaired in her ability to deal with normal pressures in a competitive work setting."  Tr. 1000.

In the "Summary and Conclusions" section, Dr. Swearingen stated:

The claimant's mental illness affects her ability to concentrate due to her depression and anxiety.  It affects her ability to follow directions, concentration, interpersonal relationships and stress tolerance.  She has depression when dealing with her family, in past and in current situations.  She will isolate herself from her siblings.

18

> She has anxiety and gets nervous when she has to leave the house, being around other people or when her mother leaves the house.  The claimant is mentally impaired by her anxiety and depression, causing her inability to work.

Tr. 1000.

### c.  Reviewing psychologists

On May 12, 2017, state agency psychological consultant Mark K. Hill, Ph.D., considered Fisher's allegation of depression/anxiety.  Tr. 601-602, 605-607.  In doing so, Dr. Hill completed a Psychiatric Review Technique ("PRT") (Tr. 601-602) and Mental RFC Assessment (Tr. 605-607).  In the PRT, Dr. Hill found mild limitations in ability to understand, remember and apply information and moderate limitations in ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  Tr. 602.

In the Mental RFC, with respect to understanding and memory limitations, Dr. Hill indicated that Fisher was moderately limited in her ability to understand and remember detailed instructions but she appeared capable of understanding and remembering simple 1-3 step tasks.  Tr. 605.  With respect to sustained concentration and persistence limitations, Dr. Hill noted that Fisher's psychological symptoms would limit her concentration, persistence and pace and her ability to tolerate normal work pressures but Fisher would be able to perform 1-3 step tasks with no more than moderate pace or production quotas.  Tr. 606.  With respect to social interaction limitations, Dr. Hill indicated that the significant anxiety that Fisher exhibited when she was with the consultative examiner was not in evidence with other providers and found that Fisher's interactions with others would need to be on a superficial level with no customer service duties, conflict resolution or persuading others.  Tr. 606.  With respect to adaptation limitations, Dr. Hill indicated that Fisher's psychological symptoms would limit Fisher's ability to adapt to change but she would be able to work in an environment where change is explained and gradually

introduced.  Tr. 606-607.  In explaining her Mental RFC findings, Dr. Hill noted that Fisher was

helping take care of her father and her behavior at the psychological consultative visit was

partially consistent with her behavior in other settings/appointments.  Tr. 607.

Upon reconsideration, on July 25, 2017, state agency psychological consultant Kristen

Haskins, Psy.D., considered Fisher's allegation of depression/anxiety.  Tr. 641-642, 645-647.  In

doing so, Dr. Haskins completed a PRT (Tr. 641-642) and Mental RFC Assessment (Tr. 645-

647).  Except with respect to the portion of the Mental RFC regarding Fisher's understanding

and memory limitations, Dr. Haskins reached the same conclusions as Dr. Hill.  In the area of

understanding and memory limitations, Dr. Haskin found that, in addition to Fisher appearing

capable of understanding and remembering simple 1-3 step tasks, Fisher appeared capable of

understanding and remembering moderately complex tasks.  Tr. 646.

**C.**     **Testimonial evidence**

  **1.**     **Plaintiff's testimony**

Fisher was represented and testified at the January 14, 2016, (Tr. 35-43), and July 10,

2018, hearings (Tr. 544-553).

At the 2016 hearing, Fisher explained that she had filed for disability in 2013 because she

could not stand being around people or leaving her house.  Tr. 35.  She really did not leave her

house unless her parents made her go to the store with them or if she had a doctor's appointment.

Tr. 35-36.  Even when Fisher is at home she does not want to be around a lot of family members.

Tr. 42.  If Fisher is home alone and she knows somebody is going to be coming over, she gets

nervous and shaky and has even hidden in the attic.  Tr. 42. Fisher explained that she received

treatment for her psychological problems at Catalyst Life Services.  Tr. 37.  If Fisher is in the

waiting room at her doctor's office and someone sits down next to her she has to get up and leave.  Tr. 42-43.

During the 2018 hearing, Fisher stated she lived with her mom and brother at her mom's house.  Tr. 545.  Fisher was not responsible for any chores and she did not do any cooking.  Tr. 546.  Fisher is able to get herself bathed and dressed but sometimes her mother has to remind her to take a bath.  Tr. 546.  Fisher was in a car wreck when she was a teenager, so she has not and does not want to drive.  Tr. 546-547.  She has always relied on someone else for transportation.  Tr. 547.  Fisher always worked with a family member when she was employed.  Tr. 547-548.

Fisher was asked about her trip out of state in 2014.  Tr. 548.  She explained that her mother had gone to Kentucky to take care of Fisher's uncle who was dying of cancer and Fisher went with her mother because there was no one for Fisher to stay with at home.  Tr. 548.  Fisher does not stay alone because it causes her to get really stressed and she is scared to stay alone – she cries and shakes.  Tr. 549.

Fisher leaves the house to see Ms. Jarvis and Nurse Santee for appointments.  Tr. 549-550.  Fisher stated that the medication she is prescribed helps her except it does not help her with her sleep issues.  Tr. 550.  She explained she has some very weird dreams.  Tr. 550.  During the day, Fisher plays with dolls.  Tr. 550-551.  If a family member comes over, she can talk to them for a little bit but not for very long.  Tr. 551.  Fisher's doctors have recommended that she attend therapy for her back problems but she has not attended because she does not want to be around people.  Tr. 551-552.  Being around people makes Fisher feel nauseated and she shakes and cries.  Tr. 552.

When Fisher's dad was sick, her mother and siblings helped take care of him.  Tr. 552.  Fisher did not provide physical care for him.  Tr. 552-553.  She would sit and talk with him but

she did not get to see him in the hospital to say goodbye because every time she tried to leave the house she kept getting sick.  Tr. 553.

### 2.    Vocational expert's testimony

A Vocational Expert ("VE") testified at the 2018 hearing.  Tr. 553-557. The VE described Fisher's past work to include work as: (1) a general laborer, an unskilled, medium exertion job; (2) a machine operator, a semi-skilled, medium exertion job; (3) a warehouse worker, an unskilled, medium exertion job; and (4) a prep cook and dishwasher, an unskilled, medium exertion job.  Tr. 554.

The ALJ asked the VE to consider whether Fisher would be able to return to any of her past work if the following limitations applied: able to lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently; able to sit, stand, and walk for six hours each out of an 8-hour workday; frequent climbing of ramps and stairs; occasional climbing of ladders; frequent stooping, kneeling, crouching and crawling; able to understand, remember and carry out simple, repetitive tasks; able to respond appropriately to supervisors and coworkers in a task oriented setting with no public contact and occasional interaction with coworkers; able to adapt to simple changes; and avoid hazards in a setting without strict production quotas.  Tr. 554-555.  The VE indicated that Fisher's past work as a warehouse worker or prep cook and dishwasher could be performed.  Tr. 555.  Also, the described individual could perform other unskilled, medium work in the regional or national economy, including laundry worker, hand packager, and hospital housekeeper.  Tr. 555-556.  The VE provided national job incidence data for the identified jobs.  Tr. 555-556.

Fisher's counsel asked the VE to consider the same set of restrictions except the individual would also have difficulty with concentration which would cause her to be off task

about 15% of typical workday or workweek.  Tr 556.  The VE indicated that the additional

restriction would eliminate all jobs.  Tr. 556.

Fisher's counsel then asked the VE to consider the ALJ's hypothetical but altering the

limitation regarding coworkers to no contact with coworkers.  Tr. 556.  The VE indicated that all

jobs would be ruled out with that restriction because all of the jobs involve working around and

in proximity to others – the jobs are not performed in isolation.  Tr. 556-557.

Finally, Fisher's counsel asked the VE whether there would be jobs available if the

individual had to leave work unexpectedly about four days per month as a result of medically

determinable impairments.  Tr. 557.  The VE indicated that such a limitation would be work

preclusive.  Tr. 557.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

23

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his July 30, 2018, decision the ALJ made the following findings:[11]

1.  Fisher meets the insured status requirements of the Social Security Act through June 30, 2017.  Tr. 515.

2.  Fisher engaged in substantial gainful activity during the following periods: March 1, 2013, through May 2, 2013. Tr. 515-516.

3.  There has, however, been a continuous 12-month period during which Fisher did not engage in substantial gainful activity.  Tr. 516.

4.  Fisher has the following severe impairments: degenerative disc disease of the lumbar and thoracic spines, diabetes with neuropathy, obesity, major depressive disorder, anxiety, agoraphobia, and post-traumatic stress disorder (PTSD).  Tr. 516.

5.  Fisher does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 516-519.

6.  Fisher has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except she can frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, and can occasionally climb ladders.  She retains the ability to understand, remember, and carry out simple, repetitive tasks; she can respond appropriately to supervisors and coworkers in a task-oriented setting with no public contact and occasional interaction with coworkers; and she is able to adapt to simple changes and avoid hazards in a setting without strict production quotas.  Tr. 519-529.

7.  Fisher is capable of performing past relevant work as a warehouse worker.  Tr. 529.  Fisher was born in 1963 and, on the alleged disability onset date, was 49 years-old, which is defined as a younger individual age 18-49.  Tr. 529.  Fisher has at least a high school education and is able to communicate in English.  Tr. 529. Transferability of job skills is not material to the determination of disability.  Tr. 530.  Alternatively, considering Fisher's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Fisher can perform, including laundry worker, hand packager, and hospital housekeeper.  Tr. 530.

---

[11] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined Fisher had not been under a disability, as defined in the Social Security Act, from February 7, 2013, through the date of the decision. Tr. 531.

## V. Plaintiff's Arguments

Fisher argues that the ALJ failed to properly weigh the opinion evidence of mental health providers – treating Nurse Santee and collaborative psychiatrist Dr. Swarn – and the consultative examining psychologist – Dr. Swearingen. Doc. 15, pp. 16-22. She contends that the ALJ erred by elevating the opinion of non-treating, non-examining physicians above examining physicians. *Id.* Fisher also argues that the RFC assessment, which provides that Fisher could perform work requiring occasional interaction with coworkers and unlimited interaction with supervisors, is not supported by substantial evidence because the RFC does not adequately account for limitations caused by Fisher's severe mental impairments. Doc. 15, pp. 22-24.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**      **Fisher has not demonstrated that the ALJ erred in weighing the opinion evidence**

Fisher argues that the ALJ failed to properly weigh the opinion evidence from Charlene Santee, her treating mental health nurse; Dr. Swarn, collaborative psychiatrist who co-signed two of Nurse Santee's opinions; and consultative examining psychologist, Dr. Swearingen.  Doc. 15, pp. 16-22.  She contends that the ALJ erred by elevating the opinion of non-treating, non-examining physicians above examining physicians.  *Id.*

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for the weight given to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).   In

27

deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).   However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167

Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490

(6th Cir. 2005).

Additionally, not all medical sources are "acceptable medical sources."  *See* 20 C.F.R. §

404.1513.  For example, nurse practitioners are medical sources but they are not considered

"acceptable medical sources."  *Id.*  However, the opinion of a medical source who is not an

"acceptable medical source" who has seen a claimant in her professional capacity is relevant

evidence.  SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006).   SSR 06-03p provides

guidance as to how opinions of medical sources who are not "acceptable medical sources" are to

be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case
> record, the case record should reflect the consideration of opinions from medical
> sources who are not 'acceptable medical sources' and . . . [a]lthough there is a
> distinction between what an adjudicator must consider and what the adjudicator
> must explain in the disability determination or decision, the adjudicator generally
> should explain the weight given to opinions from these 'other sources,' or otherwise
> ensure that the discussion of the evidence in the determination or decision allows a
> claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such
> opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

<u>*Nurse Santee and Dr. Swarn*</u>

The ALJ discussed and weighed the three opinions provided by Nurse Santee, two of

which were co-signed by Dr. Swarn, stating:

> Partial weight is given to the opinions of the claimant's treating counselor, Charlene
> Santee, PMHCNS-BC (Exhibits 13F/l-2, 24F/2-4, 32F). First, the undersigned
> notes that Ms. Santee is not an acceptable medical source. At Exhibit 13F/l-2, Ms.
> Santee provided forms with check boxes marked, indicating that the claimant
> generally was "occasionally" to "rarely" able to function in the areas of "making
> occupational adjustments," "intellectual functioning," and making personal and
> social adjustment." Another form with check boxes was provided at Exhibit 32F,
> with Ms. Santee indicating that the claimant had between mild to marked
> impairments and was unable to function around a lot of people, isolating most of
> the time to her room when around family members. Little weight is given to both

> Exhibit 13F/l-2 and 32F, as these forms are not generally consistent with the overall records, including Ms. Santee's own examinations of the claimant. For example, at Exhibit 24F/2-4, Ms. Santee indicates that the claimant's memory was intact and her ability to remember, understand and follow directions, and maintain attention was within normal limits unless she had increased anxiety and depression (Exhibit 24F). This is generally more consistent with the overall records, noting the claimant to be calm, alert, oriented, in no acute distress, cooperative, and with normal psychiatric behavior throughout the records (Exhibits 3F, l0F, l1F, l7F, 21F, 27F, 28F). Other counseling notes also indicate that the claimant generally reported improvement with proper medication (Exhibits 19F, 20F, 24F, 31F).

Tr. 528.  As correctly noted by the ALJ, while Nurse Santee had a treatment relationship with Fisher, she was not an acceptable medical source.  Thus, her opinions were not entitled to deference or controlling weight under the treating physician rule.  Fisher does not dispute that Nurse Santee was not an acceptable medical source.  However, she argues that reversible error occurred because the ALJ did not note that two of the opinions – those dated January 7, 2016, (Tr. 420-421), and July 18, 2017 (Tr. 1025-1027) – were also signed by Dr. Swarn, a "collaborating psychiatrist."  Doc. 15, p. 18.  She contends that Dr. Swarn was an acceptable medical source and therefore since he signed the two opinions, the opinions were entitled to analysis under the "treating physician" rule.

In order to be deemed a "treating source" for purposes of the treating physician rule, the provider must be both an an "acceptable medical source" and there must be an "ongoing treatment relationship." *See* 20 C.F.R. § 404.1527(a)(2); *see also Hargett v. Comm'r of Soc. Sec.*, --- F.3d ---, 2020 WL 3833072, * 3-4 (6th Cir. July 8, 2020).  In the recently decided *Hargett* case, the Sixth Circuit found that an ALJ should have considered a functional capacity evaluation (FCE) completed by a physical therapist and co-signed by the claimant's treating physician as a treating-source opinion.  *Hargett*, 2020 WL 3833072, * 5.  In *Hargett*, "no one dispute[d] that [the doctor who co-signed the FCE] had an ongoing treatment relationship with [the claimant.]"  *Id.* at * 4.  Here, in contrast, the record does not support a finding that an ongoing treatment

relationship existed between Dr. Swarn and Fisher.  *See e.g.*, Tr. 1024 (the cover sheet associated

with the July 18, 2017, opinion indicates that Fisher "[s]ees Vicki Jarvis and Charlene Santell").

And, Fisher points to no evidence in the record documenting any treatment relationship between

Dr. Swarn and Fisher.  This is so even after the lack of evidence of a treatment relationship

between Dr. Swarn and Fisher was raised by the Commissioner in his brief.  Doc. 18, p. 13

("Plaintiff suggests Dr. Swarn was a treating source, but there is no evidence that Dr. Swarn ever

treated Plaintiff (Pl. Br. at 18-19, 22).  Dr. Swarn's name is absent from all of the treatment

notes.  The only time her name is included in the medical records is as a co-signature on Ms.

Santee's opinion, where Dr. Swarn is listed as a "collaborating psychiatrist" (Tr. 1027)[]").

Considering that Fisher has not identified any evidence of a treatment relationship between Dr.

Swarn and Fisher, the Court finds that that ALJ did not err in failing to mention or note that two

of Nurse Santee's opinions were co-signed by Dr. Swarn.  *See e.g., Engebrecht v. Comm'r of

Soc. Sec.*, 572 Fed. Appx. 392, 398-399 (6th Cir. July 14, 2014) (unpublished) (finding no error

when an ALJ failed to expressly address that a doctor signed two letters where there was no

evidence that the doctor was a treating source).

Even though Nurse Santee was not an acceptable medical source and even though her

opinions were not entitled controlling weight analysis under the treating physician rule, the ALJ,

consistent with the regulations, provided sufficient explanation for his decision to assign only

partial or little weight to her opinions.

Fisher contends that the medical evidence supports the greater limitations such as those

set forth in Nurse Santee's opinions, pointing out that treatment notes consistently document

Fisher's alleged difficulty being around people or her inability to leave the house.  While it is

correct that Fisher's medical treatment records document instances of the foregoing, the ALJ did

not fail to consider Fisher's medical treatment history, including evidence documenting the

foregoing mental health issues and symptoms.  Tr. 523-526.  Thus, Fisher's argument amounts to

the request that this Court consider the case de novo.  However, it is not for this court to "try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745

F.2d at 387.  Further, even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336

F.3d at 477.

Here, while Fisher disagrees with the ALJ's weighing and consideration of the evidence,

Fisher has not shown that the ALJ failed to consider Nurse Santee's opinions, evidence relating

to Fisher's mental health treatment history, and/or Fisher's subjective statements regarding her

symptoms.  For example, the ALJ included various restrictions in the RFC to account for

limitations caused by Fisher's mental impairments, including a limitation that Fisher have "no

public contact and occasional interaction with co-workers."  Tr. 519.  Although Fisher contends

that greater limitations should have been included, she has not shown that the ALJ did not

consider or weigh the opinions of Nurse Santee in light of the entirety of the record and Fisher

has not shown that the ALJ's decision to assign partial or little weight to Nurse Santee's opinions

was not supported by substantial evidence.

### Dr. Swearingen

The ALJ discussed and weighed the opinion rendered by Dr. Swearingen, the

consultative examining psychologist, stating:

> Some weight is given to the opinions of psychological consultative examiner Dr.
> Swearingen (Exhibit 22F). While Dr. Swearingen generally indicated that the
> claimant has impairments in the four "paragraph B" domains, he did not provide a
> function-by-function analysis, nor did he provide his opinions using vocationally

relevant terminology. The undersigned agrees that the claimant has limitations in these areas, but finds the overall evidence to more consistently describe the claimant's functional abilities than a one-time evaluation with Dr. Swearingen.  For example, although she appeared tearful and anxious upon examination, the objective evidence generally notes the claimant to present as calm, alert, oriented, in no acute distress, cooperative, and with normal psychiatric behavior throughout the records (Exhibits 3F, 10F, 11F,  17F, 21F, 27F, 28F). Her depression, anxiety, concentration, motivation, and energy, generally improved with medication treatment as well (Exhibits 13F, 19F, 20F, 24F, 31F). Thus, only some weight is assigned.

Tr. 527-528.

As a non-treating source, Dr. Swearingen's opinion was not entitled to analysis under the treating physician rule.  *See Kornecky*, 167 Fed. Appx. at 508; *Daniels,* 152 Fed. Appx. at 490. Nevertheless, the ALJ considered and explained the reasons for providing only some weight to his opinion.

Fisher contends that in weighing Dr. Sweaingen's opinion, the ALJ ignored evidence. Doc. 15, pp. 21-22.  However, the ALJ did not ignore evidence that Fisher suggests was ignored, e.g., evidence regarding mental status examinations showing blunted or labile or sad or tearful affect or evidence regarding Fisher's reported difficulties being around people.  *See e.g.*, Tr. 517-523-525.  Thus, Fisher's contention amounts to a claim that the evidence should have been weighed differently with a different outcome.  However, as indicated above, it is not the role of this Court to consider the evidence de novo.  And, here, Fisher has not shown that the ALJ's reasons for providing only some weight to Dr. Swearingen's opinion are unsupported by substantial evidence.

Further, Fisher's contention that, as an "examining" psychologist, Dr. Swearingen's opinion should have received more weight than "non-examining" psychologists (Doc. 15, p. 20) fails.  An ALJ is not required to provide more weight to examining physicians than non-examining physicians.  *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the

33

medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.")  (emphasis supplied).  Rather, whether there is an examining relationship is one of multiple factors considered when evaluating a medical opinion. 20 C.F.R. § 404.1527(c).  In any event, the ALJ did not provide more weight to the state agency psychological consultants; the ALJ assigned "some weight" to those opinions as well.  Tr. 527.

For the reasons discussed herein, the Court finds that Fisher has not demonstrated that the ALJ erred in weighing the opinion evidence.

## C.     Fisher has not shown that the RFC is unsupported by substantial evidence

Fisher argues that the ALJ erred by finding that Fisher retained the RFC to perform work requiring occasional interaction with coworkers and unlimited interaction with supervisors.  Doc. 15, pp. 22-24.  She claims that the finding is not supported by substantial evidence, arguing that Fisher's ongoing symptoms from anxiety and depression cause greater non-exertional limitations than found by the ALJ.  *Id.*

In advancing her RFC argument, Fisher relies upon the opinions of her treating providers and the consultative examining psychologist.  Doc. 15, p. 23.  However, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  The ALJ found that Fisher had the following mental RFC:

> [Fisher] retains the ability to understand, remember, and carry out simple, repetitive tasks. [Fisher] can respond appropriately to supervisors and co-workers in a task-oriented setting with no public contact and occasional interaction with co-workers.  Additionally, she is able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

Tr. 519.

In formulating the RFC, the ALJ weighed the opinion evidence and, as discussed above, Fisher has not shown that the ALJ erred in that regard.  While Fisher disagrees with the ALJ's decision and weighing of the evidence, she has not shown that the ALJ ignored evidence or that the RFC is not supported by substantial evidence.  And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Considering the foregoing, the Court finds that Fisher has not shown a basis upon which this matter should be reversed and remanded for further consideration or evaluation of the evidence or Fisher's RFC.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: July 22, 2020                          */s/ Kathleen B. Burke*
                                              Kathleen B. Burke
                                              United States Magistrate Judge